## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARY ROMERO, as Next Friend of**
**JOSHUA A. ROMERO**,

     Plaintiff,

      vs.         No. 08cv1055 MCA/LFG

**CHERYL BRADFORD,**

     Defendant,

**BOARD OF EDUCATION OF THE**
**ALBUQUERQUE PUBLIC SCHOOLS,**

     Intervenor.

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** is before the Court on the following motions: *Defendant Bradford's Motion For Summary Judgment On Qualified Immunity Grounds* [Doc 67]; *Defendant Cheryl Bradford's Opposed Motion To Strike Mary Romero As Next Friend* [Doc 70]; *Plaintiff's Opposed Motion For Voluntary Dismissal Of Count III (First Amendment Violation) With Prejudice* [Doc 86]; *Defendant Bradford's Motion For Summary Judgment On Qualified Immunity Grounds On The First Amendment Retaliation Count And Memorandum In Support* [Doc 69]; *Intervenor APS' Motion For Judgment On Punitive Damage Claims, And Memorandum Of Points And Authority In Support Thereof* [Doc 66]; *Intervenor APS' Motion To Strike The Expert Opinions Of Dr. Foote And Memorandum Of Points And Authorities In Support Thereof* [Doc 68].   Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court

resolves the motions as explained below.

## I.    BACKGROUND

In 2006, Joshua Romero was a participant in a program called Adult Connections to Community Education and Support Services (ACCESS). Defendant Cheryl Bradford (Bradford) was assigned to serve as Joshua's "Community Support Liason" (CSL).  Her duties consisted of reviewing Joshua's psychological evaluations, his Individual Educational Plan (IEP), implementing recommendations from the IEP, and helping Joshua transition from high school into the community.  In 2007, according to the *Amended Complaint For The Recovery Of Damages Caused By The Deprivation Of Civil Rights* [Doc 17], Bradford initiated a sexual relationship with Joshua.

Joshua, through his sister (Plaintiff), filed a complaint against Bradford for deprivations of his rights to due process, equal protection, and freedom of speech, pursuant to 42 U.S.C. § 1983.  Albuquerque Public Schools (APS) filed a motion to intervene, [Doc 20] which was granted by the Court [Doc 29].  As indicated above, there are currently six motions pending before the Court.  Each motion is addressed in turn, beginning with Bradford's motion for summary judgment.

## II.    ANALYSIS

### A.    *Defendant Bradford's Motion For Summary Judgment On Qualified Immunity Grounds* [Doc 67]

Summary judgment under Fed.R.Civ.P. 56(c) "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2).  "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading. . . ."  Fed.R.Civ.P. 56(e)(2).  Instead, "its response must . . . set out specific facts showing a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

42 U.S.C. § 1983 provides, in relevant part, that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Persons sued in their individual capacity under this civil-rights statute generally are entitled to qualified immunity unless the plaintiff can establish that the defendant's actions violated a specific federal statutory or constitutional right and that the allegedly violated rights were clearly established at the time of the conduct at issue.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001); Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001).  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

Although the qualified immunity cases previously required courts to first evaluate the right asserted and then turn to whether the right is clearly established, the Supreme Court of the United States recently adjusted the analysis.  In Pearson v. California, 129 S.Ct. 808 (2009), the Court held that the established procedure—constitutional right, first and clearly

established, second—"should not be regarded as an inflexible requirement." Id. at 813. The

Pearson Court offered many reasons for abandoning the mandatory order of analysis, but

pertinently, "[a]dherence to [the] two-step protocol departs from the general rule of

constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on

questions of constitutionality . . . unless such adjudication is unavoidable." Id. at 821 (final

alteration in original) (internal quotation marks and citation omitted). Thus, the order of

analysis now rests in the district court's discretion. See id. (recognizing that district courts

"should have the discretion to decide [which] procedure is worthwhile in particular cases").

Ultimately, if a plaintiff cannot show that a clearly established constitutional right was

violated, the Court must grant the defendant qualified immunity. See Gross, 245 F.3d at

1156.

Plaintiff contends that Bradford violated Joshua's clearly established constitutional

rights to equal protection and to substantive due process. Bradford responds that she is

entitled to qualified immunity with respect to both claims and that as a result, summary

judgment in her favor is warranted. The Court evaluates each asserted constitutional right

in turn, beginning with equal protection.

## 1.    Equal Protection

The Fourteenth Amendment to the United States Constitution prohibits the states from

denying "to any person within its jurisdiction the equal protection of the laws." U.S. Cons.

amend. XIV, § 1.   "An allegation of sexual harassment is actionable under § 1983 as a

violation of the Equal Protection Clause." Noland v. McAdoo, 39 F.3d 269, 271 (10th Cir.

1994); see Starrett v. Wadley, 876 F.2d 808, 814-15 (10th Cir. 1989) (concluding than an employer's sexual advances toward an employee constituted discrimination based on the employee's sex and "thereby deprived her of the right to equal protection of the laws").  In our Circuit, it is a clearly established constitutional violation for a state employee to utilize governmental authority in order to subject another person to sexual harassment.  Maestas v. Lujan, 351 F.3d 1001, 1009 (10th Cir. 2003).  Alternatively, Bradford violated Joshua's equal protection rights if her conduct subjected Joshua to sexual discrimination, the conduct was unwelcome, and the conduct was sufficiently severe or pervasive as to interfere unreasonably with Joshua's school performance and create a hostile or abusive educational environment.  See Escue v. N. Okla. College, 450 F.3d 1146, 1157 (10th Cir. 2006).  Essential to either an "abuse of authority" claim or a "hostile environment" claim is evidence that the sexual interaction between the state actor and the plaintiff was not consensual.

Plaintiff contends that Bradford utilized her authority as a teacher in order to subject Joshua to an unwanted sexual relationship and that the unwanted sexual advances adversely affected Joshua's participation in the ACCESS program—thus, Plaintiff makes a claim pursuant to both of the above-mentioned equal protection theories.  [Doc 71 at 6, 10] Bradford counters that the relationship was a consensual relationship between two adults, and therefore, there was neither harassment nor discrimination.  [Doc 67 at 17]  In response to that argument, Plaintiff maintains that Joshua did not—or could not—consent to the relationship because of the power imbalance between Bradford and Joshua and because of Joshua's emotional immaturity.  [Doc 71 at 8]  Notably, Plaintiff does not argue that Joshua

was or is incapable of consenting to a sexual relationship based on his learning disabilities.

Turning to the evidence on the question of consent, throughout his deposition, Joshua repeatedly stated that the emotional and allegedly sexual relationship was consensual.  For example, Joshua indicated that he had feelings for Bradford:

> Question:   Do you start having feelings for Cheryl at some point in the future, after October 2007?
>
> Answer:     Yeah.
>
> . . . .

[Doc 67-3 at 2]  Further, when describing a sexual encounter, Joshua stated that Bradford took her clothes off and then he "did the same after that."  [Id. at 3]  Joshua was asked whether Bradford asked him to take his clothes off and he said "I decided to do it on my own."  [Id.]  At another point, the questioner asks "So you—I mean, you were telling her how much you liked her putting her hand on your penis?" and Joshua responded, "Yeah." [Id. at 5]  When asked about telephone calls in which the pair engaged in "phone sex," Joshua testified that both he and Bradford initiated the calls.  [Id.]  In describing one of the alleged sexual encounters, Joshua related the following:

> When she made it seem like I was crazy again.  And then—because, you know, she—she made up a story to Diana and everybody at ACCESS that she was, like, 'You had a threesome with Christopher?'  And—you know, my cousin, you know, with his girlfriend.  And that made me mad, you know.
>
> I was like, 'What?'
>
> And then she said—and then I told her, 'What do you'—I got mad, you

know.  I was like, 'Why are you doing that," you know.  'You want to mess with me?  I'm like Scarface,' I told her, you know, I mean.

And she, like—after that, she gave the phone to Diana.  And I was mad, still.  And then I think they hung up.  And then she went over there to my house.  And then I was like—she said—or I said, 'Come up,' you know.

So she came up, you know.  And I told her—I told her, 'Cheryl, why did you tell them like that?  Why did you—why did you make them seem like I was, you know, like—like—like, in the wrong or something,' you know.

And then that's when she started to—when she started—like, she kicked off her sandals.  And then after that, she—she sat on top of me.  And then—and I was, you know, sitting on my bed, you know.  And then she sat on top of me, and she—she—she started to say, you know, it was—like, she—oh, like, 'I want to do this and then I don't.  I want to, and then I don't.

She was like going back and forth.  And then I told her to kiss me.  And she did.  And then—and then we went, like—we sat down on the floor.  And then she was on top of me.  And then like she was kissing me.  And that's when—well, you know, that was when I told her to, you know, to suck, you know, after that.

[Id. at 6]  Joshua's deposition also includes the following exchange:

Question:     Did you ever ask her for intercourse?

Answer:        No.

Question:     Did you ever ask to touch her breasts?

Answer:        No.

Question:     Did you have ask to touch her behind?

Answer:        No.

Question:     Did you ever put your hand on her vagina?

Answer:        Yeah.

Question:     Did you ever ask her to let you do that?

Answer:       No.

Question:     Would you just do that if you wanted to?

Answer:       No.

Question:     You never put your hand on her vagina?

Answer:       Not if I—you know, not if I just wanted to out of nowhere.

Question:     Uh-huh.  Would you ask her for permission?

Answer:       Well, I mean, if there was a reason, 'cause when I did it, we were both, like without any clothes.

Question:     Uh-huh.  And you felt that was okay?

Answer:       Yeah.

Question:     And during that activity, whenever you guys were together with no clothes, was it okay for you to touch her breasts?

Answer:       I think so, yes.

Question:     And it was okay for you to suck on her breasts?

Answer:       Yeah.

Question:     And it was okay for you to put your hand on her behind?

Answer:       Yeah.

Question:     And all of those things, you did of your own accord?

Answer:       Yeah.

Question:     I mean, your own decision.

Answer:       (Witness indicates)

Question:     Is that a 'yes?'

Answer:       Yes.

[Id. at 6-7]  Joshua further related that on one occasion, Bradford came to his apartment and she was talking about her family.  After that conversation, Joshua "told her to give [him] a blow job."  [Id. at 8]  At another point in the deposition, Joshua was asked "when did you fall in love with Cheryl, if you ever fell in love with Cheryl?" and he responded, "It was about like—yeah, yeah, yeah.  I did.  I did."  [Id. at 11]  Finally, Joshua expressed the following opinions about his relationship with Bradford:

Question:     In terms of the relationship that you had with Cheryl Bradford, as I understood it, that relationship arose at the time that she was divorced, right?

Answer:       Yes.

Question:     And you weren't seeing anybody?

Answer:       Right.

Question:     Was there anything wrong with that relationship, in your eyes?

. . . .

Answer:       Not until she started like, playing with, you know, my emotions.

Question:     And that occurred when she wasn't sure if she wanted to commit to you 100 percent?

Answer:       Right.

Question:     And you did want more of a commitment.

Answer:       I did want more of a commitment.  Yeah.

| | |
|---|---|
| Question: | And sometimes she would say yes, and sometimes she'd say no in terms of that commitment? |
| Answer: | Right. |
| Question: | Up until that time, you believed that the relationship was an okay one? |
| . . . . | |
| Answer: | Yeah. |

[Id. at 14]

Plaintiff focuses on three other exchanges from Joshua's deposition in order to demonstrate that he did not want to participate in a sexual relationship with Bradford.  The first exchange, in its entirety, reads as follows:

| | |
|---|---|
| Joshua: | I think the next time was when we went to my apartment.  But right before, when she picked me up from my house that I was living at. |
| Question: | Was that with your mom? |
| Answer: | Yeah, with my mom. |
| Question: | Okay. |
| Answer: | She told me—we were driving.  And she told me, 'Remember, Josh.  This is lust, not love.'<br><br>And it's, like, she didn't give me, like, a—she just said—she didn't give me much of a choice, it seemed.  Like, she said, 'I thought we were going to take care of that right now,' you know, the sex thing?  And like, I was just, like, quiet.  I was just, like— |

| | |
|---|---|
| Question: | When you say she didn't give you me much of a choice, what does that mean? |
| Answer: | Well, it kind of felt that way.  Because the way she said—like, the way she said, 'I thought that's what'—'I thought that's what we were going to take care of right now.'  And I'm not sure what I said that she said that.  But I remember her saying that. |
| Question | Saying what? |
| Answer: | Oh.  'I thought'—'I thought that's what we were going to'— |
| Question: | 'Take care of that right now?' |
| Answer: | Yeah. |
| Question: | Okay.  My question had to do with your statement that she didn't give you much choice. |
| Answer: | Yeah. |
| Question: | Did you mean, I would have like a little romancing before the sex and not just the sex first? |
| Answer: | Yeah.  Okay. |
| Question: | Okay. |
| Answer: | Because the way she said, 'It's'—'it's not'—'it's not love, it's lust,' that was kind of like—you know, kind of like—it just—it was like, how do you say, blank, maybe?" |
| Question: | Uh-huh.  Uh-huh.  I think I feel you.  And you would have wanted more of the love first? |
| Answer: | Yeah. |

[Id. at 2]  Plaintiff offers this testimony as evidence of the "power imbalance" between

Joshua and Bradford and argues that this testimony shows that Joshua did not "encourage"

the relationship.  [Doc 71 at 8]  It would appear from this interchange, however, that Joshua

was a willing participant in the couple's activities—even if he would have approached the

relationship differently.  Nothing about this dialogue demonstrates that Joshua's will was

overborne or coerced.

      Plaintiff also points to the following exchange:

| | |
|---|---|
| Question: | And then, after she left the things on the doorstep, you called her.  Right? |
| Answer: | Right. |
| Question: | And what did you tell her when you called her? |
| Answer: | I think I said, 'Come over.' |
| Question: | And why did you ask her to come over? |
| Answer: | I don't know. |
| Question: | Was it something that you hoped would happen when she came over? |
| Answer: | No. |
| Question: | Were you still interested in her romantically? |
| Answer: | Not no more, because the way she was. |
| Question: | And when she came over, what happened? |
| Answer: | Well, she tried to, like—expose herself.  And I was like, 'No, I don't want that,' I told her. |
| Question: | When you say 'expose herself,' like, show you her breasts? |
| Answer: | Like kind of pulled her pants down a little. |

Question:      Okay.  And this was at the Academy Terrace apartment?

Answer:        Yeah.

Question:      Okay.  And what did you do when she tried to pull her pants down a little?

Answer:        I said, 'No, I don't want that.'

Question:      And then what happened?

Answer:        And then she got up.  And then she was going to take her shirt off and unbutton her bra.  And I said, 'I don't want that,' you know.  And then she wanted to kiss me, but I didn't want to kiss her.  But then she kissed me anyway.

Question:      Do you remember when this happened?

Answer:        This was maybe January 2nd, maybe.

Question:      So at this point in time, school was not in session, correct?

Answer:        Right.

Question:      Okay.  Did—and then after you said, 'No, I don't want that,' then what happened next?

Answer:        She just kissed me.  And then, like, she walked away.  And then, like, she sat down on the couch.  And I was sitting down, too.  And then, like, she wanted to leave.  And then—well, I broke her phone, right, you know.

And after that, she wanted to leave.  But then I said, 'I want to go with you.'  So then I went with her, you know, to go pay for her phone, help her pay for her phone.

[Doc 67-3 at 15]  This, Plaintiff contends, is evidence that Joshua continually attempted to stop Bradford's  conduct.  Plaintiff fails to relate, however, that after this incident, Joshua never saw Bradford again, apart from a hearing related to a restraining order.  [Doc 80-1 at

9]  Further, Joshua testified that this was the only time that he asked her not to do something.
[Doc 67-3 at 7]  Thus, evidence exists to support a single unwanted kiss.

Finally, Plaintiff states that "Joshua called Bradford's immediate supervisor
requesting she not come to his apartment anymore, yet Bradford went anyway.  It was after
this attempt to stop her returning that Joshua made the recording and gave it to school
officials." [Doc 71 at 9]  Diana Keogh, Bradford's supervisor, testified that Joshua called
her in December 2007 and asked that Bradford not to come by his apartment.  [Doc 71-1 at
7]  Keogh stated that she conveyed the message to Bradford, but that Bradford nevertheless
went to Joshua's apartment to drop off a Christmas present.  [Id. at 7-8]  It was at this time,
when Bradford went to leave the gift, that Joshua made the recording.  [Doc 71-4 at 9, 10]

During this visit, Bradford first briefly attempted to encourage Joshua to stay with the
ACCESS program.  [Id. at 2]  Then, Bradford discussed her personal difficulties.  [Id. at 2-5]
At that point the discussion turned to their relationship, and  Bradford told Joshua that they
need to be friends:

| | |
|---|---|
| Bradford: | I love you. |
| Joshua: | Cheryl. |
| Bradford: | I love you. |
| Joshua: | We're in the same—you do. |
| Bradford: | I love you but we have to be friends. |
| Joshua: | No, we don't. |

Bradford:     We have to be friends.

Joshua:       It wouldn't be right without it.

Bradford:     Joshua, it can't be more. Please understand that. Joshua, please
              understand. Okay. I don't want to lie to you. We can't have
              more. But we can be friends. Okay? Can we? Can we be
              friends forever? And if we have sex (inaudible). Okay? I gotta
              go.

Joshua:       Wait, I gotta talk to you more, Cheryl.

Bradford:     You know, I gotta go, I really have to. Josh.

Joshua:       (inaudible) Record. Come on, Cheryl, look. Wait, Cheryl.

Bradford:     (inaudible)

Joshua:       Huh?   Cheryl, it's the way it's gotta be.   (inaudible)
              determination. Cheryl. Do you have anything else to say?
              Come on? Come on, Cheryl. Hey, come on. Cool it. How do
              you like it (inaudible) table (inaudible)? Suck.

[Id. at 8-9]  The next portion of the recording appears to memorialize a sexual encounter

between Bradford and Joshua—which is borne out by Joshua's deposition testimony, in

which he states that Bradford performed oral sex at the time that he was recording. [Doc 67-

3 at 8-9]

        Plaintiff argues that Bradford's disregard for Joshua's request that she stay away from

his apartment is evidence that the entire sexual relationship was not consensual—that he

consistently resisted her sexual advances.  The evidence supports that Bradford went to

Joshua's apartment after he asked her not to come.  The recording, however, does not support

Plaintiff's contention that Joshua was resistant to a sexual relationship—Bradford attempted

to leave, and Joshua requested that she stay and perform oral sex.  Having reviewed the deposition testimony and the recording transcript, the evidence does not support that Joshua was an unwilling participant in a sexual relationship with Bradford—at most, the proffered evidence establishes that Bradford kissed him once against his will and that she went once to his apartment after he asked her not to come.

Nevertheless, the question remains whether Joshua was capable of meaningful consent.  One of Plaintiff's statements of material fact is that "[a]n imbalance of power existed which made Joshua incapable of consenting to sex with his counselor."  [Doc 71 at 4]  For evidentiary support, Plaintiff cites a psychological evaluation conducted by Dr. William Foote.  In that evaluation, Dr. Foote gives four bases for his opinion that this was not "just another relationship between two consenting adults." [Doc 71-3 at 1]

> First, Cheryl Bradford was in a professional role relative to Joshua. . . . If the local district attorney views her as a 'counselor,' it may be that her alleged exploitation of Joshua would fall under the ambit of NMSA 39-1-10, which makes the relationship between a counselor and her patient an element of coercion in the crime of sexual penetration.
>
>     . . . .
>
> Second, in her role as Joshua's Community Support Liason, Cheryl Bradford was in a position of power relative to Joshua, and controlled his continuation in the ACCESS program, with all of the benefits that Joshua had enjoyed.
>
>     . . . .
>
> Third, there is a large disparity between the ages of Cheryl Bradford and Joshua.
>
>     . . . .

> Fourth, Joshua is a young man who is, because of his disabilities, behaviorally much younger than his given age.  At age 20, before the relationship with Cheryl Bradford, he had never had a date.  He was a virgin.  Although he had sufficient knowledge about sex, and was aware of the risks of pregnancy and STDs, he was naive about emotional costs of intimate relationships.  If his emotional age were considered as a legal variable, what is alleged to have occurred in this case would be child sexual abuse.

[Doc 71-3]  These opinions from Plaintiff's proposed expert[1] raise a disputed question of material fact regarding the existence of a constitutional violation.  The question of Joshua's ability to consent is unquestionably material to Plaintiff's equal protection claim.  Despite the evidence that Joshua consented and willingly participated, if he was not capable of giving such consent, a reasonably jury could conclude that Bradford sexually harassed Joshua or abused her authority over him.

In order for a reasonable jury to reach this conclusion, it will have to disregard Joshua's testimony and find Dr. Foote's explanation of Joshua's abilities to be reasonable and credible.  The jury would have to view Joshua's version of events through the lens of Dr. Foote's evaluation.  These are clearly factual determinations, which are historically the province of the jury.  See Escue, 450 F.3d at 1157 ("The Supreme Court has observed that

---

[1]  APS has challenged the methodology of Plaintiff's expert and have argued that his opinions should be excluded pursuant to Daubert.  Specifically, APS challenges Dr. Foote's use of the term "emotional age" and the pinpointing of Joshua's emotional age, as well as his evaluation of the interaction between Joshua and Bradford as a whole, as opposed to simply the sexual aspect of the relationship.  An analysis of that *Motion* follows below.  Nevertheless, Dr. Foote's evaluation of Joshua's ability to participate in a consensual adult relationship has not been challenged—APS has not challenged his methodology as a psychologist—even if he is not permitted to testify specifically about "emotional age."  Thus, presumably admissible evidence—subject to foundation—exists to support Plaintiff's claim.

the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." (internal quotation marks and citation omitted)).

Neither side has presented any cases to support or refute Plaintiff's specific theory of constitutional liability.  Indeed, few cases address the intricacies of Section 1983 actions against care givers or teachers who allegedly sexually harass their purportedly mentally disabled adult students or patients.  Considering the cases that discuss equal protection and sexual harassment in other contexts, it is clearly established that a state official may not impose a sexual relationship on another person.  This is true in the workplace.  See Woodward v. City of Worland, 977 F.2d 1392, 1401 (10th Cir. 1992) ("Typically, liability under the Equal Protection Clause for sexual harassment in the workplace is predicated upon some authority that the wrongdoer has over the victim.").  This is true in the public schools. See Sh.A v. Tucumcari Mun. Sch., 321 F.3d 1285, 1289 (10th Cir. 2003) ("[A] reasonable teacher would have known in the spring of 1997 that sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context.").  This is true in the universities.  See Escue, 450 F.3d at 1157 (premising equal protection liability in part on unwelcome sexual conduct perpetrated on a student by a university professor).

Based on the well-established cases pertaining to sexual harassment and an imbalance of power, a reasonable jury could conclude that a community support liaison should have known that a sexual relationship with an adult student who was incapable of consenting to

sex would give rise to a violation of equal protection.  See Baptiste v. J.C. Penney Co., 147

F.3d 1252, 1255-56 (10th Cir. 1998) ("For a right to be clearly established, [t]he contours of

the right must be sufficiently clear that a reasonable official would understand that what he

is doing violates that right.  Plaintiff is not required to show that the very conduct in question

has previously been held unlawful.  She is, however, required to demonstrate the

unlawfulness was 'apparent' in light of established law.  Generally, this requires that the

plaintiff demonstrate a substantial correspondence between the conduct in question and prior

law allegedly establishing that the defendant's actions were clearly prohibited." (alteration

in original) (internal quotation marks and citations omitted)).  Accordingly, Bradford is not

entitled to qualified immunity with respect to Plaintiff's equal protection claim.

**2.**     **Substantive Due Process**

The Fourteenth Amendment to the United States Constitution also guarantees that no

state "shall deprive any person of life, liberty, or property, without due process of law. . . ."

U.S. Cons. amend. XIV, § 1.  "The Clause cover[s] a substantive sphere as well, barring

certain government actions regardless of the fairness of the procedures used to implement

them."  Seegmiller v. LaVerkin City, 528 F.3d 762, 766-67 (10th Cir. 2008) (alteration in

original) (internal quotation marks and citation omitted).  Our Circuit has recognized two

applications of the substantive due process doctrine:  "[o]ne strand protects an individual's

fundamental liberty interests, while the other protects against the exercise of governmental

power that shocks the conscience."  Id. at 767.  A fundamental right "is one that is deeply

rooted in this Nation's history and tradition and implicit in the concept of ordered liberty."

Id. (internal quotation marks and citation omitted).  With regard to conduct that shocks the

conscience our Circuit has observed the following:

> Conduct that shocks the judicial conscience . . . is deliberate government
> action that is arbitrary and unrestrained by the established principles of private
> right and distributive justice.  This strand of substantive due process is
> concerned with preventing government officials from abusing their power, or
> employing it as an instrument of oppression.  Not all governmental conduct is
> covered, however, as only the most egregious official conduct can be said to
> be arbitrary in the constitutional sense.

Id. (internal quotation marks and citation omitted).  A plaintiff may satisfy either standard

in order to state a claim for a substantive due process violation.  Id.  Plaintiff argues that

Bradford's conduct both shocks the conscience and violates Joshua's fundamental rights.

Bradford again asserts qualified immunity as a defense.

Turning first to Joshua's fundamental rights, it is clearly established that "the liberty

specially protected by the Due Process Clause includes the [right] . . . to bodily integrity. .

. ." Washington v. Glucksberg, 521 U.S. 702, 720 (1997).  Plaintiff contends that Bradford's

unwelcome sexual advances violated Joshua's right to bodily integrity.  [Doc 71 at 11]

Bradford maintains her position that the alleged sexual relationship was consensual.  For the

same reasons as were stated in the previous section, disputed questions of fact remain with

regard to Joshua's ability to consent to the alleged sexual relationship.  If a jury credits Dr.

Foote's testimony, Bradford manipulated Joshua and coerced him into participating in a

sexual relationship—thus, a reasonable jury could conclude that Bradford violated Joshua's

clearly established fundamental right to bodily integrity.  See Union Pac. R.R. Co. v.

Botsford, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").[2]

The Court determines that Plaintiff has not provided evidence that Bradford's conduct, as related by Plaintiff, "shocks the conscience." As stated earlier, "[n]ot all governmental conduct is covered, however, as only the most egregious official conduct can be said to be arbitrary in the constitutional sense." Seegmiller, 528 F.3d at 767. Our Circuit has further explained the following:

> An assault—standing alone—does not suffice to make out a constitutional substantive due process claim. But an assault under a stated threat, a threat the victim knows an assaulting government official has the authority to carry out, can separate the ordinary common law tort from the substantive due process claim. The combination of serious physical abuse and the assaulting official's use of official authority to force the victim to submit can shock the conscience.

Williams v. Berney, 519 F.3d 1216, 1223 (10th Cir. 2008). Plaintiff contends that Bradford abused her power and position of authority as an educator and counselor in order to "foster and push a sexual and romantic relationship with her student." [Doc 71 at 1] Plaintiff has

---

[2] In that regard, our Circuit has noted that "[a]lthough courts often emphasize that qualified immunity is effectively lost if the case goes to trial, pursuing qualified immunity during trial is not pointless. To the contrary, the doctrine of qualified immunity shields a defendant both from trial and from damages." Maestas, 351 F.3d at 1008 (internal quotation marks and citation omitted). "Thus, even when a defendant has lost his right not to stand trial, the law is clear the [defendant] can reassert [his] qualified immunity claims at and after trial when the factual disputes have been resolved." Id. at 1009 (alterations in original) (internal quotation marks and citation omitted).

not provided any evidence that Bradford forced Joshua to participate or that she threatened him in anyway.  Particularly lacking is any evidence that Joshua knew that Bradford could carry out any threat of action.  Instead, Joshua testified that he was concerned about Bradford, that she would lose her job as a result of their relationship.  [Doc 67-3 at 13]

Plaintiff has alleged that Bradford controlled Joshua's ability to participate in the ACCESS program, but the evidence does not support this contention.  Even after Joshua reported the alleged relationship, Keogh, Bradford's supervisor, was instructed to act as Joshua's CSL.  [Doc 71-1 at 10]  Ultimately, the undisputed evidence demonstrates that Joshua elected not to continue in the ACCESS program.  [Doc 67-1 at 4]  In addition, although Bradford instructed Joshua not to tell anyone about the relationship, there is no evidence that Bradford threatened Joshua in this regard.  Bradford's conduct, as reported by Plaintiff, does not shock the conscience.  There is no indication of a "stated threat," that Joshua recognized that Bradford could carry out the stated threat, or that Bradford wielded her authority in order to force Joshua to submit to the relationship.  As a result, Bradford is entitled to qualified immunity for Plaintiff's "shock the conscience" claim.

**3.    Summary**

Questions of fact remain regarding Joshua's mental ability to engage in a consensual sexual relationship with Bradford.  The Court therefore cannot rule as a matter of law that the relationship between Joshua and Bradford was voluntary.  Accordingly, a reasonable jury could conclude that the sexual relationship that occurred was the result of a government employee using her authority to manipulate the emotions and responses of a mentally

incapacitated adult student or that a sexual relationship occurred that violated Joshua's right to bodily integrity.  Bradford's summary-judgment motion is therefore denied.

**B.**      ***Defendant Cheryl Bradford's Opposed Motion To Strike Mary Romero As Next Friend*** [Doc 70]

Bradford has further moved the Court to remove Mary Romero, Joshua's sister, as "next friend" and Plaintiff.  [Id. at 1]  Specifically, Bradford contends that discovery has revealed that there is no factual basis for the continued appointment of a "next friend."  [Id. at 1-2]  Plaintiff responds that Joshua has been a special education student, that he has difficulty processing information and understanding consequences, that he does not "pick up" on things that he observes, and that he has a "limited capacity to understand social sequences and events."  [Doc 74 at 1-2]  In addition, Plaintiff asserts that Joshua is on a "regime of medications" and is being treated for schizophrenia.  [Id. at 2]  Bradford disputes that Joshua is being treated for schizophrenia—citing Plaintiff's own expert, who stated, with reference to an evaluation conducted in February 2008, "I didn't see schizophrenia with him."  [Doc 82-1 at 5]

Bradford maintains that Plaintiff has failed to demonstrate that Joshua is incompetent.  [Doc 82 at 1]  Fed. R. Civ. P. 17(c) permits a representative to "sue or defend on behalf of a minor or an incompetent person."  In addition, Rule 17(b)(1) directs that a party's capacity to sue or be sued is determined, "by the law of the individual's domicile."  According to the corresponding New Mexico Rules of Civil Procedure, "[w]hen an infant or incompetent person has a representative, such as a general guardian, or other like fiduciary, the

representative may sue or defend on behalf of the infant or incompetent person." Rule 1-017(C) NMRA.  This rule refers to an appointed representative, and according to New Mexico law, such a representative is appointed only after a petition has been filed, notice is given, a hearing is set, an attorney is provided for the allegedly incapacitated person, and the allegedly incapacitated person is evaluated by a qualified health care professional.  <u>See</u> NMSA 1978, § 45-5-303(A)-(D) (2009).  In addition, the court appoints an "visitor" to interview the proposed guardian and the allegedly incapacitated person.  Section 45-5-303(E).  The required hearing is then conducted, on the record, and upon request, a jury trial is afforded.  Section 45-55-303(F)-(L).

Based on the law of New Mexico, the appointment of a guardian who has the representative capacity to sue is no light or offhand task.  Certainly, more is required than the submission of an affidavit and an outdated IQ score.  Although Plaintiff states that Joshua suffers from some learning disabilities, she has not established that he is incompetent under New Mexico law.

Nor is this Court satisfied that the record otherwise supports a finding of incompetence.  <u>See</u> Rule 17(C)(2) (observing that a "minor or incompetent person who does not have a duly appointed representative may sue by next friend").  Throughout his deposition testimony, Joshua was able to follow the questioning and respond appropriately.  In addition, the recording that Joshua made, cited to previously, demonstrates that he is able to evaluate his situation and make decisions.  Further, Joshua is represented by counsel.  Although this Court is not bound by state competency procedures, Plaintiff has not

established circumstances that would compel this Court to find Joshua to be incompetent,

independent of the state court system.   See Sanders v. Kansas Dep't of Social & Rehab.

Servs., 317 F.Supp.2d 1233, 1239 (D. Kan. 2004) (refusing to permit a mother to serve as

next friend for the complaining party because "the record before the court fail[ed] to show

incompetence and plaintiff [had] never been adjudicated incompetent" under state law).

Accordingly, Defendants' *Motion* is granted, and Plaintiff is ordered to substitute the

real party in interest in lieu of the inappropriately named next friend.

## C.   *Plaintiff's Opposed Motion For Voluntary Dismissal Of Count III (First Amendment Violation) With Prejudice* [Doc 86]

Plaintiff has filed a motion to dismiss Count III of her complaint with prejudice.  [Doc

86 at 1]  Bradford and APS argue that any such dismissal should be conditional—that any

dismissal should be accompanied by a finding that Count III was adjudicated on the merits

and that the undisputed material facts set forth in *Defendant Bradford's Motion For

Summary Judgment On Qualified Immunity Grounds On The First Amendment Retaliation

Cound And Memorandum Brief In Support* [Doc 69] should be deemed to be admitted.  [Doc

89 at 2]

"Federal Rule of Civil Procedure 41(a)(2) governs voluntary dismissals after the

opposing party has filed an answer or motion for summary judgment."  Clark v. Tansy, 13

F.3d 1407, 1411 (10th Cir. 1993).  The rule is "designed primarily to prevent voluntary

dismissals which unfairly affect the other side, and to permit the imposition of curative

conditions."  Id. (internal quotation marks and citation omitted).  APS cites Clark, as well as

Phillips USA, Inc. v.  Allflex USA, Inc., 77 F.3d 354, 358 (10th Cir. 1996).  In both cases,

our Circuit describes a number of factors for the Court to consider, in the event that a

plaintiff requests dismissal *without prejudice*.  See id.; Clark,13 F.3d at 1411.  In the present

case, Plaintiff proposes that the Court dismiss Count III *with* prejudice, thus neither APS nor

Bradford need be concerned that this allegation will again rear its head.

Further, both parties expended time and resources on a motion for summary judgment

related to Count III.  Bradford filed the motion in October 2009, Plaintiff responded to

Bradford's proposed undisputed material facts in December 2009, and Bradford also replied

in December 2009.  There is no indication that Plaintiff intends to "avoid an adverse decision

on a dispositive motion by dismissing a claim without prejudice."  Phillips USA, Inc., 77

F.3d at 358.  For this Court to find the facts admitted as they are outlined by Bradford in her

motion, as she requests, would be to give Bradford a disproportionate benefit.

*Plaintiff's Opposed Motion For Voluntary Dismissal Of Count III (First Amendment*

*Violation) With Prejudice* [Doc 86] is granted, and Count III is dismissed prejudice, but

without the conditions urged by APS and Bradford.  As a result of this ruling, *Defendant*

*Bradford's Motion For Summary Judgment On Qualified Immunity Grounds On The First*

*Amendment Retaliation Count And Memorandum In Support*, [Doc 69] is further denied as

moot.

**D.**     ***Intervenor  APS'  Motion  For  Judgment  On  Punitive  Damage  Claims,  And***
     ***Memorandum Of Points And Authority In Support Thereof*** [Doc 66]

APS contends that Plaintiff's claim for punitive damages should be dismissed because

the authorizing statute, NMSA 1978, § 41-4-4(C) ( 2001), violates the New Mexico

Constitution, Article IX, § 27.  [Doc 66 at 2]  Section 41-4-4(C) reads as follows:

> A governmental entity shall pay any award for punitive or exemplary damages
> awarded against a public employee under the substantive law of a jurisdiction
> other than New Mexico, including other states, territories and possessions and
> the United States of America, if the public employee was acting within the
> scope of his duty.

APS argues that this law is contrary to Article IX, § 27 of the state constitution:  "No law

shall be enacted giving any extra compensation to any public officer, servant, agent or

contractor after services are rendered or contract made; nor shall the compensation of any

officer be increased or diminished during his term of office, except as otherwise provided in

this constitution."  NM Const., Art. IX, § 27.  Punitive damages, APS argues, are "extra

compensation," which under Section 41-4-4(C), would be paid to Bradford, a public officer,

after services had been rendered or the contract had been made.

At the outset, it is to be noted that "[i]t is well settled that there is a presumption of

the validity and regularity of legislative enactments."  New Mexico ex rel. Udall v. Pub.

Employees Ret. Bd., 120 N.M. 786, 788, 907 P.2d 190, 192 (1995) (internal quotation marks

and citation omitted).  Such enactments must be upheld unless the Court is "satisfied beyond

all reasonable doubt that the Legislature went outside the bounds fixed by the Constitution

in enacting the challenged legislation."  Id.  Viewed in that light, APS has stretched the

application of  Section 27 beyond recognition.  Section 27 is designed to prevent public

employees from receiving "gratuities from public funds for past services."  New Mexico ex

rel. Hudgins v. Pub. Employees Ret. Bd., 58 N.M. 543, 548, 273 P.2d 743, 746 (1953),
*rejected on other grounds by* Pierce v. State, 1996-NMSC-001, ¶ 51, 121 N.M. 212, 910 P.2d
288, (quoting Raines v. Bd. of Trustees of Illinois State Teachers' Pension & Ret. Fund, 365
Ill. 610, 617, 7 N.E.2d 489, 492 (1937) (Hudgins).

      The Hudgins Court's characterization of Section 27 is in line with the factual
circumstances of the few New Mexico cases that have construed the provision.  In Gonzales
v. Pub. Employees Ret. Bd., 114 N.M. 420, 839 P.2d 630 (Ct. App. 1992), the New Mexico
Court of Appeals considered "what retirement benefits fifty-two former long-term state
employees are entitled to receive after having resigned from their state jobs in order to work
for local government employers for a short time before retirement."  Id. at 421, 839 P.2d at
631.  The Hudgins Court itself considered whether changes in an elective retirement plan
violated Section 27.  58 N.M. at 544-46, 273 P.2d at 744-45.  Similarly, in New Mexico ex
re. Sena v. Trujillo, 46 N.M. 361, 129 P.2d 329 (1942), the Supreme Court of New Mexico
considered whether, under a the precursor to Section 27,

> a pension for every person who has served the territory and the State of New
> Mexico for a period of 30 consecutive years and who has passed the age of 65
> years, is applicable to one who meets the requirements of the Act as to period
> of service and age, but who had left the service of the State prior to the
> enactment of the statute.

46 N.M. at 362, 129 P.2d at 329.  These cases involve the application of statutory benefits,
which have been altered in some way during or after a course of public employment.  APS
has failed to point the Court to any cases that hint, much less satisfy this Court "beyond all

reasonable doubt," that Section 27 is intended to apply to tort recovery and punitive damages. The inapplicability of Section 27 to the facts that are currently before the Court is apparent—APS has not identified a "gratuity from public funds," which would be received by Bradford and that could be considered compensation "for past services."

APS cites <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981), and argues that "neither reason nor justice supports the imposition of punitive damages upon the shoulders of blameless and unknowing taxpayers." [Doc 66 at 1] In <u>City of Newport</u>, the Supreme Court of the United States considered whether "a municipality may be held liable for punitive damages under § 1983." <u>Id.</u> at 249. In that case, the plaintiff sued the city directly, among other defendants, and ultimately, the jury assessed punitive damages against the city. <u>Id.</u> at 252-53. The Court concluded that "[b]ecause absolute immunity from such damages obtained at common law and was undisturbed by the 42nd Congress, and because that immunity is compatible with both the purposes of § 1983 and general principles of public policy, . . . a municipality is immune from punitive damages under 42 U.S.C. § 1983." <u>Id.</u> at 271.

Thus, although punitive damages cannot be *assessed* against a municipality, <u>City of Newport</u> does not consider whether it is appropriate for a municipality, or a state government, to *assume* the responsibility to pay punitive damages in the event that such damages are assessed against a public employee. All of the policy reasons cited by APS and <u>City of Newport</u> disregard the statutory reality that the State of New Mexico has, under certain circumstances, elected to pay "an award for punitive damages . . . awarded against

a public employee." Section 41-4-4(C).  Having established that Section 41-4-4(C) violates

neither the state nor the federal constitution, APS's policy arguments are best addressed to

the New Mexico State Legislature.  *Intervenor APS' Motion For Judgment On Punitive*

*Damage Claims, And Memorandum Of Points And Authority In Support Thereof*. is denied

[Doc 66]

**E.**      ***Intervenor APS' Motion To Strike The Expert Opinions Of Dr. Foote And***

***Memorandum Of Points And Authorities In Support Thereof*** [Doc 68]

APS additionally challenges the admissibility of the opinions of Plaintiff's expert, Dr.

Foote.[3]  [Doc 68]  The admissibility of expert testimony is governed by Rule 702 of the

Federal Rules of Evidence.  Rule 702 states the following:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

"Rule 702 imposes on a district court a gatekeeper obligation to 'ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable.'"  Goebel v.

Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 991 (10th Cir. 2003) (*quoting* Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).  It has been made clear that "where

---

[3]  Plaintiff has not requested a hearing on this issue, but instead has provided affidavit
support attached to her response.  As a result, it appears that the Court has been given all
relevant information that the parties deem necessary to evaluate the suitability of Dr. Foote's
proposed testimony.

[expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." Goebel, 356 F.3d at 991 (alterations in original) (internal quotation marks and citations omitted).

APS does not dispute Dr. Foote's credentials. Instead, APS contends that certain opinions of Dr. Foote are not based on a reliable methodology or are not relevant to the ultimate issues. Beginning with the question of reliability, our Circuit observed in Goebel that the Daubert Court listed "four nonexclusive factors" that may be considered by a district court when assessing the reliability of a proposed expert:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

Goebel, 356 F.3d at 991-92. "Regardless of the specific factors at issue, the purpose of the Daubert inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Goebel, 356 F.3d at 992 (internal quotation marks and citation omitted).

Initially, it is vital to define the parameters of the inquiry. APS contends that Dr. Foote's opinion is unreliable in so far as it relates to the calculation of an "emotional age." Review of Dr. Foote's credentials and his report demonstrates that he is qualified to render

an opinion regarding Joshua's mental state and to provide a psychological context for Joshua's decisions.  Dr. Foote conducted a "battery of psychological tests which included both cognitive and personality measures," he reviewed Joshua's school and hospital records, and he met with Joshua and some of his family.  [Doc 68-2 at 12, 1]  From these sources, Dr. Foote opined that Joshua "has very poor social skills, and a very limited capacity to understand social sequences and events."  [Id. at 14]  Further, Dr. Foote concluded that "[i]n general, [Joshua] has difficulty dealing with putting things in order, understanding what comes next, and planning.  All of these problems have resulted in a learning disability which has kept him in special education classes throughout his schooling."  [Id.]  These opinions are unchallenged and are reasonably based on Dr. Foote's observations, training, and experience.

Nevertheless, Dr. Foote has not outlined the methodology that he utilized to form the opinion that "Joshua Romero is a 20 year old male who functions in many respects like a 12 or 13 year old."  [Id. at 14]  Instead, Dr. Foote explains, by way of affidavit, that "[a] large body of research on adolescent development in fact stands for the proposition that the average 12 or 13 year old adolescent differs in a host of ways from a young adult of 19." [Doc 72-1 at 1]  Indeed, the citations offered by Dr. Foote consistently demonstrate that on a neurological and behavioral level, adolescents function differently than adults.  See Laurence Steinberg, *Should the science of adolescent brain development inform public policy?*, 64 Am. Psychologist, 739-750 (2009); Laurence Steinberg et al., *Age differences in sensation seeking and impulsivity as indexed by behavior and self-report:  evidence for a*

*dual systems model*, 44 Dev. Psychol. 1764-1778 (2008); Jacquelynne S. Eccles et al., *Cognitive Development in Adolescence*, *in* 6 Handbook of Psychology 325, 325-345 (Richard M. Lerner et al. eds., 2003); Thomas Grisso, *Preparing for Evaluations in Delinquency cases*, *in* Forensic Evaluation of Juveniles 1, 28 (Professional Resource Press, 1998); C. Oliver Weber, *Further tests of the Wells emotional age scale*, 27 The J. of Abnormal & Soc. Psychol., 65-78 (1932); C. Oliver Weber, *The concept of "emotional age" and its measurement*, 24 The J. of Abnormal & Soc. Psychol., 466-471 (1930).  None of these sources, however, establish a means for evaluating an adult in order to ascertain an "emotional age."  Neither does the cited material explain how a standard emotional age scale could be constructed.  Nor, most relevantly, do the sources explain how a person can be evaluated to determine his position on the scale, relative to the norm.  Dr. Foote does not aver that he employed any reproduce-able, standardized, tested, accepted, or peer-reviewed methodology in order to calculate Joshua's "emotional age."  See Goebel, 356 F.3d at 991-92.  Accordingly, although Dr. Foote will be permitted to testify about the observations and diagnoses that led him to formulate his opinion about Joshua's emotional capabilities, he will not be permitted render opinions about Joshua's specific "emotional age."

APS's also argues that "Dr Foote's opinions regarding Ms. Bradford's non-sexual interactions with [Joshua] should be excluded. . . ."  [Doc 68 at 11]  APS contends that Dr. Foote should be permitted to testify only about the effects of sexual contact because only a sexual relationship would be sufficient to establish a constitutional violation.  [Id. at 10]  APS insists that testimony that "Bradford confused and emotionally manipulated" Joshua is

not admissible under Rule 702 because such testimony would not assist the trier of fact and is further inadmissible under Fed. R. Evid. 403 because it would confuse the jury. [Id. 10-11] Plaintiff responds that Dr. Foote's testimony regarding the relationship as a whole is relevant to both liability and damages. [Doc 72 at 6-7] Specifically, Plaintiff argues that Dr. Foote's testimony will assist the trier of fact to determine "the general exploitive nature of the relationship, the boundary violations, and role reversals" as well as "emotional duress" and "the disparity between the functional levels" of Bradford and Joshua." [Id. at 6]

Dr. Foote's testimony regarding the effects on Joshua of any non-sexual aspects of the relationship is relevant to establish whether Joshua was capable of willingly participating—Bradford's behavior throughout the relationship could have a "tendency to make the existence" of Joshua's consent more or less likely. Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Further, the jury will be instructed on the boundaries of the alleged constitutional violation, thus alleviating any confusion that could arguably result. Dr. Foote's testimony is therefore not limited to the effects of the sexual aspect of the relationship.

A number of the conclusions in Dr. Foote's report, however, are irrelevant to the question at hand. For example, Dr. Foote states that Bradford's actions may have been a violation of New Mexico law, depending on whether "the local district attorney views her as a 'counselor.'" [Doc 68-2 at 15] The inclinations of the local prosecutor—or even

whether Bradford committed violations New Mexico law that were not pleaded in the complaint—are not relevant to whether the alleged relationship violated Joshua's constitutional rights.   Dr. Foote further has no knowledge—personal, scientific, or technical—of the ACCESS program and Bradford's professional role.

Accordingly, *Intervenor APS' Motion To Strike The Expert Opinions Of Dr. Foote And Memorandum Of Points And Authorities In Support Thereof* [Doc 68] is granted in part and denied in part.

## III.   CONCLUSION

For the reasons stated above, the parties' motions are granted in part, denied in part, and deferred in part, or rendered moot all as set forth above..

**IT IS THEREFORE ORDERED** that *Defendant Bradford's Motion For Summary Judgment On Qualified Immunity Grounds* [Doc 67] is **DENIED**; *Defendant Cheryl Bradford's Opposed Motion To Strike Mary Romero As Next Friend* [Doc 70] is **GRANTED**; *Plaintiff's Opposed Motion For Voluntary Dismissal Of Count III (First Amendment Violation) With Prejudice* [Doc 86] is **GRANTED**; *Defendant Bradford's Motion For Summary Judgment On Qualified Immunity Grounds On The First Amendment Retaliation Count And Memorandum In Support,* [Doc 69] is **DENIED AS MOOT**; *Intervenor APS' Motion For Judgment On Punitive Damage Claims, And Memorandum Of Points And Authority In Support Thereof* [Doc 66] is **DENIED**; and *Intervenor APS' Motion To Strike The Expert Opinions Of Dr. Foote And Memorandum Of Points And Authorities In Support Thereof* [Doc 68] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED** this 30th day of September,  2010, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge